**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**QUINNIPIAC COLLEGE, Respondent.**

No. 00–4099.

United States Court of Appeals, Second Circuit.

Argued Dec. 5, 2000.

Decided July 02, 2001.

Anna L. Francis, Attorney, National Labor Relations Board, (Leonard R. Page, General Counsel; Aileen A. Armstrong, Deputy Associate General Counsel; Fred

L. Cornnell, Jr., Supervisory Attorney, on the brief), Washington, DC, for Petitioner.

Mark R. Kravitz, Wiggin & Dana, (Alisa T. Rulnick, John G. Zandy, on the brief), New Haven, CT, for Respondent.

Before JOHN M. WALKER, Jr., Chief Judge, JON O. NEWMAN and STRAUB, Circuit Judges.

STRAUB, Circuit Judge:

Petitioner National Labor Relations Board ("NLRB" or "Board") petitions, pursuant to 29 U.S.C. § 160(e), for enforcement of its final decision and order (1) finding that Respondent Quinnipiac College ("Quinnipiac" or "College") violated sections 8(a)(1) and (5) of the National Labor Relations Act ("NLRA" or "Act"), 29 U.S.C. § 158(a)(1) & (5), by refusing to bargain with the Security Department Membership ("SDM" or "Unit"), an organization of Quinnipiac security personnel whom the NLRB had certified as the exclusive bargaining representative of Quinnipiac's security employees, and (2) requiring Quinnipiac to bargain with SDM. Quinnipiac contends that SDM was improperly certified because the Unit includes supervisors, in violation of the Act.

For the reasons given below, we hold that the Board erred in concluding that certain Quinnipiac security employees—shift supervisors and acting shift supervisors—were not "supervisors" within the meaning of the NLRA, 29 U.S.C. § 152(11). In remedying this error, we find that the Board is better situated to determine whether elimination of the supervisors from the Unit is sufficient or whether the supervisors' involvement in the formation and governance of SDM taints the entire Unit such that decertification and a new election are required. Accordingly, we deny enforcement of the order and remand the case for further proceedings consistent with this opinion.

## BACKGROUND

This action arises out of the efforts of security personnel at Quinnipiac College to organize for purposes of collective bargaining, pursuant to the NLRA, 29 U.S.C. § 159(a). Quinnipiac is a private university in Hamden, Connecticut, with approximately 2600 students and 700 staff. The College's security department is headed by the Chief of Security and Safety, Donell Spears, and his assistant, John Twining, and consists of approximately thirty employees, including two shift supervisors, eighteen assistant supervisors (four of whom serve as acting shift supervisors), six dispatchers, and four traffic control officers. The department operates twenty-four hours per day, seven days per week, with three shifts per day—7:30 a.m. to 4:00 p.m., 4:00 p.m. to 12:00 a.m., and 12:00 a.m. to 8:00 a.m.

As described by the Board, the security department's work includes controlling traffic and parking, as well as

> patrolling all buildings to ensure that they are locked; swiping a card through "data acquisition units" in the course of their patrol; responding to requests for assistance and other emergencies or alarms in the residence halls; contacting and dealing with the appropriate authorities (e.g., police or fire department, gas company or facilities employees, and residence hall officials) in the event of an emergency or other unusual situation; coordinating the evacuation of dormitories when warranted; working in conjunction with residence hall officials when special incidents arise therein, such as the search of a student[']s room or the confiscation of illegal items; and preparing "case incident reports" result-

ing from service calls or other interactions with students and the public.

(NLRB Decision and Direction of Election, Case No. 34–RC–1717, May 10, 1999). Spears and Twining, who perform no work in the field, have primary responsibility for the administration and supervision of the security department. Spears works Monday through Friday from 7:00 a.m. to 4:00 p.m. and Twining works Tuesday through Saturday from 4:00 p.m. to 12:00 a.m. The department's shift supervisors and acting shift supervisors report directly to Spears and Twining and are in command of their shift in the absence of Spears and Twining. During the 7:30 a.m. to 4:00 p.m. shift on Saturday and Sunday, the security department has no shift supervisors or acting shift supervisors on duty. Shift supervisors earn approximately $3.00 per hour more than assistant supervisors. When assistant supervisors serve as acting shift supervisors, they receive an additional $1.00 per hour.

In April 1999, a group called the Security Department Membership petitioned the NLRB for certification as the collective bargaining representative of Quinnipiac's security employees. SDM's organizer and president was James Gahran, an assistant supervisor and, at times, an acting shift supervisor. The petitioned-for unit was defined as

> [a]ll full-time and regular part-time security department employees, including dispatchers, traffic control officers, assistant supervisors, acting shift supervisors and shift supervisors ... but excluding all other employees, and pro-

fessional employees and supervisors as defined in the Act.

The NLRA allows employees to organize and bargain collectively. *See* 29 U.S.C. § 159(a). However, it expressly excludes "supervisors" from any collective bargaining rights. *See* 29 U.S.C. § 152(3) (excluding "supervisor" from definition of "employee"); *id.* § 164(a) ("[N]o employer ... shall be compelled to deem individuals defined ... as supervisors as employees for the purposes of any law ... relating to collective bargaining."). Quinnipiac opposed SDM's attempt at certification on the ground that the six shift supervisors and acting shift supervisors [1] are "supervisors" within the meaning of section 2(11) of the Act, 29 U.S.C. § 152(11), such that certification of the Unit would be improper. Quinnipiac argued that the shift supervisors should be excluded from the Unit, and also moved to dismiss the entire petition for certification, claiming that the supervisors had impermissibly participated in the formation of the Unit and the filing of the petition.

On April 26, 1999, a hearing officer of NLRB Region 34 conducted a hearing to determine whether certification of SDM was appropriate. After the hearing, the Regional Director of NLRB Region 34 issued a Decision and Direction of Election, dated May 10, 1999, in which he concluded that the shift supervisors were not statutory supervisors.[2] Accordingly, he certified the Unit and ordered an election by the security employees to determine whether they desired SDM to represent them for

---

1. Both the shift supervisors and acting shift supervisors are hereinafter referred to as "shift supervisors," because it is undisputed that acting shift supervisors have the same responsibilities and authority during their shift as the regular shift supervisors, and because Quinnipiac did not distinguish between the two in opposing certification.

2. Because he found that the shift supervisors were not statutory supervisors, the Regional Director denied the College's motion to dismiss the petition based on the shift supervisors' participation in the formation of the Unit and filing of the petition, without addressing the issue.

collective bargaining purposes. On May 24, 1999, Quinnipiac sought NLRB review of the Regional Director's decision. A three-member panel of the Board denied the request by a two-to-one vote. On June 4, 1999, the Board conducted a representation election, which SDM won by a vote of 17 to 6. The Regional Director then issued a Supplemental Decision and Certification of Representative, certifying that SDM is the exclusive collective-bargaining representative of Quinnipiac's security employees. The College again sought Board review, but the Board denied Quinnipiac's request, again by a two-to-one vote.

Once certified, SDM asked Quinnipiac to bargain over working conditions and to provide information relating to the College's security employees, employee benefits, and employment policies and procedures. Quinnipiac, however, declined to bargain or to furnish the information because it believed the Board's certification of SDM was erroneous and wished to obtain appellate review of SDM's certification. Thus, on September 9, 1999, the Board issued an unfair labor practice complaint against Quinnipiac pursuant to 29 U.S.C. § 158(a)(1) and (5). Quinnipiac answered by admitting its refusal to bargain and provide information, but justified that refusal by arguing that the certified Unit did not constitute an appropriate unit for bargaining. On January 7, 2000, the Board unanimously granted summary judgment to Region 34, and ordered Quinnipiac to bargain with SDM. On March 19, 2000, the Board applied to this Court for enforcement of this final order.

## DISCUSSION

### I. Standard of Review

▬ If the security department's shift supervisors are "supervisors" within the meaning of the NLRA, as Quinnipiac contends, they have no right to bargain with Quinnipiac, and the NLRB's order, at least as it now reads, cannot be enforced. *See Schnurmacher Nursing Home v. NLRB,* 214 F.3d 260, 264 (2d Cir.2000); *NLRB v. Meenan Oil Co.,* 139 F.3d 311, 320 (2d Cir.1998) ("Supervisors are not protected under the NLRA and do not possess a right to bargain collectively."). "Supervisory status within the meaning of Section 2(11) of the NLRA is a question of fact," *Meenan Oil,* 139 F.3d at 320, and the burden of proving such status rests upon the party asserting it, *NLRB v. Kentucky River Cmty. Care, Inc.,* —— U.S. ——, 121 S.Ct. 1861, 1866, 149 L.Ed.2d 939 (2001); *New York Univ. Med. Ctr. v. NLRB,* 156 F.3d 405, 413 (2d Cir.1998).

▬ "The findings of the Board with respect to questions of fact if supported by substantial evidence on the record as a whole shall be conclusive." 29 U.S.C. § 160(e); *see Universal Camera Corp. v. NLRB,* 340 U.S. 474, 477–91, 71 S.Ct. 456, 95 L.Ed. 456 (1951). "Substantial evidence" means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schnurmacher,* 214 F.3d at 265 (internal quotation marks omitted). "The substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Universal Camera,* 340 U.S. at 488, 71 S.Ct. 456; *see New York Univ. Med. Ctr.,* 156 F.3d at 413 (substantial evidence standard "requires [courts] to take account of the evidence that undermines the NLRB's conclusions" (internal quotation marks omitted)). Where, as here, the Board has concluded that a party with the burden of proof has failed to prove the fact in dispute, review to determine if the Board's conclusion is supported by substantial evidence could, in some circumstances, entail a pointless inquiry because, if that party produces little or no evidence to support

its side of the factual issue, it would be the *absence* of evidence that would make the Board's conclusion supportable. But in a case like the pending one, where the record has been fully developed on the issue of supervisory status, we can examine the record as a whole, including the employer's evidence, to see if there is substantial evidence to support the Board's conclusion that the employer has not sustained its burden of proving supervisory status.

In prior opinions, we have used various formulations, not always consistent, to describe our review of the Board's findings about supervisory status. For example, we have said that "[t]he Board's findings regarding supervisory determinations are entitled to special weight," *J.L.M., Inc. v. NLRB*, 31 F.3d 79, 82 (2d Cir.1994) (internal quotation marks omitted), and also to "reduced" deference, *Spentonbush/Red Star Cos. v. NLRB*, 106 F.3d 484, 492 (2d Cir.1997). And in *Spentonbush* we said that we will generally make a "more probing" review in supervisory status cases, *id.* (internal quotation marks omitted), and yet in *Schnurmacher* we said that "we undertook a 'more probing' review of [the Board's finding on supervisory status in *Spentonbush* ] because the Board's finding led to a facially 'unconscionable result,'" *Schnurmacher*, 214 F.3d at 265 n. 1 (internal quotation marks omitted).

■ Although our prior decisions demonstrate that we have no reluctance to reject a Board finding on supervisory status when persuaded that substantial evidence to support the finding is lacking, *see, e.g., Meenan Oil*, 139 F.3d at 322; *Spentonbush*, 106 F.3d at 494, we agree with Professor Davis that "refinements about the formulas for scope of review have become more harmful than helpful," 5 Kenneth C. Davis, ADMINISTRATIVE LAW TREATISE § 29:5, at 354 (2d ed.1984) (emphasis omitted), and we think the statutory standard of "substantial evidence on the record considered as a whole" provides us with a sufficient basis for approaching the task of reviewing Board decisions, including those concerning supervisory status.

## II. Supervisory Status of the Shift Supervisors

■ "Supervisor" is defined in section 2(11) as

any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.

29 U.S.C. § 152(11).

To determine whether an employee is a supervisor under this section, three questions must be addressed: (i) does the employee have the authority to exercise at least one of the twelve listed powers?; (ii) if so, does the employee exercise a listed power using 'independent judgment'?; and (iii) does the employee exercise the power 'in the interest of the employer'? Each question must be answered in the affirmative if we are to deem the employee a supervisor under Section 2(11).

*Schnurmacher*, 214 F.3d at 264 (citing *NLRB v. Health Care & Retirement Corp. of Am.*, 511 U.S. 571, 573–74, 114 S.Ct. 1778, 128 L.Ed.2d 586 (1994)); *see also Kentucky River*, 121 S.Ct. at 1867; *New York Univ. Med. Ctr.*, 156 F.3d at 413 (noting that employer's statutory burden in proving supervisor status is light because tasks listed in definition of "supervisor" are to be read in the disjunctive); *Meenan Oil*, 139 F.3d at 321 ("If (1) an

employee possesses at least one of the listed kinds of authority *and* (2) the exercise of that power involves the use of independent judgment which goes beyond the routine and clerical, the employee qualifies as a supervisor.").

In our view, the NLRB's determinations are not supported by substantial evidence. The Board properly explained in detail the many showings that Quinnipiac did not make. But we find that the Board ignored powerful evidence tending to prove that the shift supervisors regularly engage in at least some of the enumerated tasks and that they do so guided by their independent judgment. We find that the shift supervisors engaged in at least three of the listed tasks: assigning other employees, effectively recommending discipline of other employees, and responsibly directing other employees. We thus conclude that the Board erred in deciding that the shift supervisors and acting shift supervisors are not "supervisors" within the meaning of the NLRA.

### A. *Assigning Other Employees*

■ The Board found "no evidence that the shift supervisors or acting shift supervisors play any role in the *initial* assignment and scheduling of employees" (emphasis added). The Board also found, however, that "the shift supervisor or acting shift supervisor is *ultimately* responsible for the assignment of all employees to cover particular situations that arise in the course of a shift, *and may override the dispatcher's assignment*" (emphasis added). Shift supervisors also regularly decide whether employees may leave work early due to illness or emergency, and have the responsibility to redistribute work, to find an employee from another shift, or to call in another employee if an employee does not come to work or leaves work early. This authority, as exercised by the shift supervisors, fits within the meaning of "assigning" employees in a manner that requires independent judgment. *See Superior Bakery, Inc. v. NLRB,* 893 F.2d 493, 496 (2d Cir.1990) (finding that individual had supervisory assignment authority "because he would select the people necessary to do the work at the times he chose," thereby demonstrating that he exercised independent judgment (internal quotation marks omitted)).

The Board argues that these assignment and reassignment duties do not require the exercise of independent judgment. Our review of the record compels us to disagree. As the Board itself noted, "when the shift supervisor or acting shift supervisor reports to the scene of an incident, he takes the lead in handling the situation. In such circumstances he may reassign or redeploy other security department employees, taking into consideration the employees' experience and capability to respond to a particular incident, as well as other campus security needs and requirements."

■ The Board also found that the shift supervisors' assignment duties are "guided primarily by the Employer's 'many' established policies and procedures, which are apparently maintained in a 'dispatchers book.'" When shift supervisors encounter situations not covered by the policies and procedures, the Board found, they contact Spears or Twining for instructions. As a factual matter, the evidence does not support this finding. For example, the record reveals that a shift supervisor responding to a fire alarm exercised independent judgment in assessing the situation and deploying personnel, and only called Spears at the end of the incident to "inform[ ]" him. Moreover, the existence of governing policies and procedures and the exercise of independent judgment are not mutually exclusive. *See Kentucky River,* 121 S.Ct.

at 1867 (rejecting Board's contention that employees do not use independent judgment when they exercise "ordinary professional or technical judgment in directing less-skilled employees to deliver services in accordance with employer-specified standards"); *Glenmark Assocs., Inc. v. NLRB*, 147 F.3d 333, 341 (4th Cir.1998) ("The Board mistakenly assumes that because there is an established procedure for handling a particular scheduling situation, nobody is required to think."); *see also NLRB v. Prime Energy Ltd. Partnership*, 224 F.3d 206, 211 (3d Cir.2000) (rejecting evidence that assignments were made pursuant to routine and pre-determined classifications because evidence showed that supervisors "weighed the relative urgency of immediate and unforeseen problems and directed Plant Operators to undertake necessary tasks"). The evidence here indicates that the shift supervisors continued making assignment decisions, based on their own expertise and experience, despite the existence of College policies and procedures. In short, the Board's own findings demonstrate that the shift supervisors assign and reassign employees in a manner that requires independent judgment.

### B. *Effectively Recommending Discipline*

■ The Board found that shift supervisors may "informally counsel" an employee regarding proper work procedures, and, if such counseling is unsuccessful, may "advise Spears or Twining and may recommend that the employee be disciplined." This very language—the Board's own language—demonstrates that shift supervisors recommend the discipline of other security employees. The question is whether such recommendations are "effective." *See* 29 U.S.C. § 152(11). The Board dismissed its findings regarding the recommendation of discipline because there was no evidence as to the "results or effectiveness of such recommendations," and "no employee may be disciplined without an independent investigation conducted under the direction of Spears or Twining." The Board's determination in this regard is contrary to settled law.

In *ITT Lighting Fixtures, Div. of ITT Corp. v. NLRB*, 712 F.2d 40, 45 (2d Cir. 1983), *cert. denied*, 466 U.S. 978, 104 S.Ct. 2361, 80 L.Ed.2d 833 (1984), we stated that "[t]he Act does not preclude supervisory status simply because the recommendation [for discipline] is subject to a superior's investigation."[3] *Cf. NLRB v. Yeshiva Univ.*, 444 U.S. 672, 683 n. 17, 100 S.Ct. 856, 63 L.Ed.2d 115 (1980) ("Consistent with the concern for divided loyalty, the relevant consideration is effective recommendation or control rather than final authority."). In *Meenan Oil*, we denied supervisory status, noting that the "fact that [disciplinary] reports may *result* in disciplinary action is irrelevant." 139 F.3d at 322. There, however, we found that the alleged supervisor simply notified management that there was a problem with an employee and made "no recommendation as to whether the employee should be disciplined." *Id.* Thus, the alleged supervisor had acted merely as a "conduit for information and exercise[d] no judgment in passing the knowledge along to manage-

---

**3.** The Board attempts to distinguish *ITT Lighting Fixtures* by observing that, in that case, we also found that the alleged "independent investigation" consisted of nothing more than checking to see whether the supervisor had first orally warned the employee. A review of the case, however, makes clear that we found that, *regardless*, one can be a supervisor even if one's disciplinary recommendations are subject to independent investigation. *ITT Lighting Fixtures*, 712 F.2d at 45 ("*Furthermore*, the Board's conclusion is inconsistent with the Act ....." (emphasis added)).

ment ." *Id.* Here, by contrast, as Chief Spears testified, the shift supervisors first try to rectify the problem and then have the discretion whether to report an individual for disciplinary infractions.

### C. *Responsibly Directing Other Employees*

■ Evidence also shows that the shift supervisors have the authority "responsibly to direct" the other security employees.

> To be responsible is to be answerable for the discharge of a duty or obligation. In determining whether direction in any particular case is responsible, the focus is on whether the alleged supervisor is held fully accountable and responsible for the performance and work product of the employees he directs.

*Spentonbush/Red Star Cos. v. NLRB*, 106 F.3d 484, 490 (2d Cir.1997) (internal quotation marks and citations omitted). "[A]ccountability for another's failure to perform a duty establishes as a matter of law an employee's supervisory power responsibly to direct." *Schnurmacher Nursing Home v. NLRB*, 214 F.3d 260, 267 (2d Cir.2000). Record evidence shows that a shift supervisor was reprimanded for the actions of two security employees and told that "as Shift Supervisor it is your responsibility to ensure all security personnel assigned to the campus are following college/security policies and procedures during your shift." Another document shows that a shift supervisor was told, after being involved in an incident along with another security employee, "It was incumbent upon you, as the Supervisor, to [e]nsure that this situation not be allowed to get this far out of control." The Board dismisses the first document, calling it a "single incident" that is "insufficient to show that the College consistently holds shift supervisors fully accountable for the work of the em-

ployees on their shifts," and discounts the second document because the supervisor was reprimanded for his own actions as well. This appears to be a perfect example of "the practice followed all too often by the Board of rejecting evidence that does not support the Board's preferred result." *Spentonbush*, 106 F.3d at 490; *see also NLRB v. Prime Energy Ltd. P'ship*, 224 F.3d 206, 210 (3d Cir.2000) ("The mere fact that the regional director found only one instance where a Shift Supervisor sent a Plant Operator home is hardly a reasonable basis to conclude that the authority was lacking. It simply suggests that the authority was rarely needed."). In our view, though the record contains only the two incidents discussed above, the content of the documents reveals much more. It is clear from both documents that management views the shift supervisors as responsible for the performance of the other security employees—that is, as being "in command." *See Schnurmacher*, 214 F.3d at 267 (finding that a letter reprimanding alleged supervisor "assumed the [supervisors's] power to direct the [employees]"); *id.* at 268 ("[W]here the responsibility to make [a judgment as to the need for certain actions based on specialized knowledge and experience] and to see that others do what is required by that judgment are lodged in one person, that person is a quintessential statutory supervisor.").

We suggested in *Schnurmacher* that whether an employee has the power "responsibly to direct" essentially involves a determination whether the employee's powers, in the aggregate, "amount to being in charge." *Id.* at 266. There is uncontradicted evidence that the shift supervisors are "in charge" during their shifts. Indeed, the Board itself found that the shift supervisors "are in command of their shifts when Spears or Twining is absent."

The Board dismissed these findings by concluding that the shift supervisors are "guided primarily by the Employer's 'many' established policies and procedures...." However, the record shows that the shift supervisors independently handle emergency situations, directing the other security guards, when appropriate, to evacuate buildings, to search students' rooms, to contact outside assistance such as police or fire departments, and to deploy additional security personnel. This includes those emergency situations which do not admit of resolution by rote reference to a policy manual. As Chief Spears testified, "nothing is ever routine about service calls. Independent judgments need to be made by [the] supervisors and they do make that judgment." *See Prime Energy*, 224 F.3d at 211 ("authority to assess the severity of the problem and take appropriate measures" indicates supervisor status); *cf. NLRB v. Kentucky River Cmty. Care, Inc.*, — U.S. —, 121 S.Ct. 1861, 1867, 149 L.Ed.2d 939 (2001) (rejecting Board's interpretation that employees do not use independent judgment when they exercise "ordinary professional or technical judgment in directing less-skilled employees to deliver services in accordance with employer-specified standards"); *Schnurmacher*, 214 F.3d at 269 (finding that charge nurses are "supervisors" because "where one must both determine a treatment and ensure that others administer the treatment, it can hardly be said that supervisory authority is not being exercised"); *Spentonbush*, 106 F.3d at 491 ("[W]e are at a loss to understand how the grave responsibility for preventing [the mishandling of millions of gallons of gasoline] can be swept aside by the Board as routine and clerical.").

In one of its own opinions, *Greenbrier Hotel*, 216 N.L.R.B. 721, 723 (1975), the Board found that hotel security officers were supervisors because "[w]hen an emergency situation occurs on the shift, the officer in charge determines what duties should be performed by each of the men on the shift to cope with that emergency, assigns the men to such duties, and supervises their execution." This describes the very duties performed by the shift supervisors in this case, according to the Board's own findings. The Board attempts to distinguish *Greenbrier* only with the conclusory assertion that here the shift supervisors' duties are circumscribed by the employer's policies and procedures. That conclusion is inadequate where, as here, the College presents strong evidence that the shift supervisors make independent decisions directing security guards in non-routine, atypical situations. *See Schnurmacher*, 214 F.3d at 266 (rejecting Board's "naked assertions" and "rote" conclusions that certain responsibilities are " 'routine in nature and do[ ] not require the exercise of independent judgment' "); *see also Kentucky River*, 121 S.Ct. at 1870 (noting Board's "running struggle to limit the impact of 'responsibly to direct' on the number of employees qualifying for supervisory status—presumably driven by the policy concern that otherwise the proper balance of labor-management power will be disrupted"). The record as a whole contains considerable evidence that the shift supervisors both direct the other security employees and are held accountable for those employees' performance. Accordingly, we conclude that the shift supervisors exercise the supervisory power "responsibly to direct" the security employees, 29 U.S.C. § 152(11), and that the Board's finding to the contrary was not supported by substantial evidence.

In sum, we hold that the Board's findings are inconsistent with a determination that the shift supervisors are not statutory supervisors. Our review shows that Quinnipiac has advanced convincing evidence

that the shift supervisors engage in at least three of the listed supervisory powers, and that the Board has responded to that evidence with bald assertions that the shift supervisors' responsibilities are routine. Accordingly, we find that the six shift supervisors and acting shift supervisors are "supervisors" within the meaning of 29 U.S.C. § 152(11).

## III. Remedy

■ That the Security Department Membership impermissibly includes supervisors does not end our inquiry. The mere presence of supervisors in a bargaining unit does not automatically require decertification of the entire unit. *See NLRB v. North Shore Univ. Hosp.*, 724 F.2d 269, 273 (2d Cir.1983) ("[T]he fact that supervisors are members of [a bargaining] organization does not automatically disqualify it as a statutory bargaining representative."); *see also Sierra Vista Hosp., Inc.*, 241 N.L.R.B. 631, 633 (1979) ("[W]e do not assume an 'inherent' conflict between supervisors and employees in the bargaining process.").

■ Since SDM won the representation election by a margin greater than six, the elimination of the votes of the six shift supervisors would not change the outcome of the Unit's election; even without the shift supervisors' votes, SDM would still have won the election by an 11 to 6 vote. Accordingly, SDM may be left intact, although without the shift supervisors as members. *See Schnurmacher Nursing Home v. NLRB*, 214 F.3d 260, 270 (2d Cir.2000) (excluding the votes of two employees found to be supervisors, but still partially enforcing the Board's order because the union won its election by a 30 to 5 vote and "exclusion of the two [supervisors] would not have affected the outcome"); *see also NLRB v. Meenan Oil Co.*, 139 F.3d 311, 319 (2d Cir.1998) (upholding certification of union as representative of collective-bargaining unit even though the Board erroneously included two employees in unit because their exclusion would not have changed outcome of 25 to 18 vote for union).

■ Quinnipiac, however, argues that the very participation and influence of the shift supervisors in the Unit's formation and leadership taints the Unit, requiring us to disqualify it from representing the employees. According to Quinnipiac, SDM "was founded and is dominated and governed" by the shift supervisors, and thus SDM should not have been certified at all.[4] *See* 29 U.S.C. § 158(a)(2) (providing that it is an unfair labor practice for an employer (or an agent thereof) to dominate or interfere with the formation or administration of any labor organization); *see also North Shore*, 724 F.2d at 272 (noting that "certain degrees of supervisory influence within an organization may be so great that it

---

**4.** The Board argues that Quinnipiac waived its claim seeking decertification because, while it raised the claim in the underlying representation proceeding, it failed to renew the claim in the subsequent unfair labor practice proceeding. We find no such waiver. Quinnipiac moved to dismiss SDM's initial petition on the ground that shift supervisors participated in the Unit's organization. The Board, however, declined to address the issue because it determined that the shift supervisors are not statutory supervisors. Quinnipiac then again presented the decertification issue in its request to review the Regional Director's Supplemental Decision and Certification of Representative. Finally, in its opposition to summary judgment in the unfair labor practice proceeding, Quinnipiac argued that "exceptional circumstances mandate that the Board revoke [SDM's] certification and reconsider whether the bargaining unit impermissibly includes and is dominated by supervisors under the Act." Quinnipiac thus clearly and repeatedly raised the disqualification claim.

will be unable to qualify as a bargaining representative").

The policy against bargaining units in which supervisors are actively involved is motivated by the twin goals of having employers trust the loyalty of their supervisors and having rank-and-file employees trust that their bargaining representatives will advance their best interests.

> [T]he identity and role of ... supervisors in the labor organization may operate ... to disqualify it from bargaining in certain instances. This potential for disqualification stems from an inherent statutory concern that [e]mployees have the right to be represented in collective-bargaining negotiations by individuals who have a single-minded loyalty to their interests, and the identity and role of supervisors admitted to membership in a labor organization can, in certain circumstances, compromise that statutory interest. Thus, active participation in the affairs of a labor organization by supervisors employed by the employer with whom that labor organization seeks to bargain can give rise to question about the labor organization's ability to deal with the employer at arm's length. Central factors involved in considering this issue are the employees' right to a collective-bargaining representative whose undivided concern is for their interests and the employer's right to expect loyalty from its own supervisors. Active participation by the employer's own supervisors may, in a given case, contravene either or both of these legitimate interests. Indeed, we have held that an employer has a duty to refuse to bargain where the presence of that employer's supervisors on the opposite side of the bargaining table poses a conflict between those interests.

*Sierra Vista*, 241 N.L.R.B. at 632–33 (internal quotation marks and footnotes omitted). In *North Shore*, we identified the reasons behind the concern about an employee organization in which supervisors are active participants. "First, supervisors who participate actively in a professional organization which represents (or is seeking to represent) rank and file employees who serve under them, are by the very nature of their relationship to their employer and to the professional organization subject to conflicting pressures." *North Shore*, 724 F.2d at 273. "Second, supervisors as a class have interests of their own and an organization which is itself governed in part by supervisors will tend to reflect at least in part those interests." *Id.* "Third, evidence of explicit interference in collective bargaining of the kind demanded by the Board may not be available even in cases in which the structure of a professional organization leads to a pervasive supervisory influence." *Id.* "Fourth, where supervisors are active in the internal affairs of a bargaining representative, actual violations of Section 8(a)(2) attributable to employers seem inevitable." *Id.* at 274; *see also Highland Hosp. v. NLRB*, 861 F.2d 56, 58 (2d Cir. 1988) (policy behind conflict of interest rule is "prevent[ing] agents of the employer from dominating or interfering with the activities of employees' bargaining representatives").

Thus, "[a]n employer who establishes a disqualifying conflict of interest may ... lawfully refuse to bargain. But it is clear that the burden on the employer to show such conflict is a heavy one ." *Sierra Vista*, 241 N.L.R.B. at 633. "[U]nless there is clear and present danger of a conflict of interest interfering with the collective bargaining process, resort to disqualification is inappropriate." *North Shore*, 724 F.2d at 273 (internal quotation marks omitted). Here, Quinnipiac has proffered no evidence of direct influence by the shift supervisors on the other SDM employees.

There is no evidence that the shift supervisors coerced the security employees into joining SDM, influenced the representation election, or sought to advance supervisor interests at the expense of rank-and-file interests. *See Sierra Vista,* 241 N.L.R.B. at 634 (party seeking disqualification must "adduce probative evidence substantiating a claim that supervisory participation in the affairs of the union presents a clear and present danger of interference with the bargaining process"). However, the record reflects significant involvement by the shift supervisors in the formation and governance of SDM. An organizer and the president of SDM, James Gahran, is a shift supervisor, and the vice-president and sergeant-at-arms are also supervisors. *See North Shore,* 724 F.2d at 272 ("[C]ertain degrees of supervisory influence within an organization may be so great that it will be unable to qualify as a bargaining representative."). There can be little doubt that the shift supervisors are "active in the internal affairs," *id.* at 274, of SDM.

We are thus faced with a case in which the employer has failed to present explicit evidence of supervisory interference but the concerns expressed in *North Shore* are present to some degree. In such a situation, the Board, with its expertise, is best equipped to assess whether there has been influence necessitating decertification. As in *North Shore,* "[t]he degree to which the Act requires a restructuring of a professional organization such as [SDM] is for the Board in the first instance to decide. It must, however, look at all the circumstances, including the structure of the organization and the role of supervisors in its governance." *Id.* at 275–76. Accordingly, we remand the case for a determination by the Board whether the shift supervisors so influenced the formation of SDM that the Unit must be decertified and a new election held, or whether, in light of all the

circumstances, the Unit may survive, albeit absent the shift supervisors.

## CONCLUSION

For the foregoing reasons, we hold that the NLRB's finding that Quinnipiac College's security department shift supervisors are not "supervisors" under the NLRA is not supported by substantial evidence. We thus deny the petition for enforcement. We remand the case so that the NLRB may decide whether to decertify the Unit and hold a new election or simply eliminate the six shift supervisors from the Unit's membership.