# United States Court of Appeals
## For the First Circuit

Nos. 24-1523, 24-1707

NORTHEASTERN UNIVERSITY,

Petitioner, Cross-Respondent,

v.

NATIONAL LABOR RELATIONS BOARD,

Respondent, Cross-Petitioner,

and

AMERICAN COALITION OF PUBLIC SAFETY,

Intervenor.

PETITIONS FOR REVIEW OF AN ORDER OF
THE NATIONAL LABOR RELATIONS BOARD

Before

Rikelman, Lynch, and Howard,
Circuit Judges.

Robert A. Fisher, with whom John P. Phillips and Seyfarth Shaw LLP were on brief, for petitioner.

Eric Weitz, Attorney, National Labor Relations Board, with whom Kira Dellinger Vol, Supervisory Attorney, Micah P.S. Jost, Attorney, William B. Cowen, Acting General Counsel, Peter Sung Ohr, Associate General Counsel, Ruth E. Burdick, Deputy Associate General Counsel, and Meredith Jason, Assistant General Counsel, were on brief, for respondent.

May 23, 2025

**LYNCH**, **Circuit Judge**.  These consolidated cases concern whether members of an urban university's campus police are "supervisors" within the meaning of the National Labor Relations Act (NLRA) and thus are excluded from any police union bargaining unit.  See 29 U.S.C. §§ 152(3), 152(11), 157.  The National Labor Relations Board (the "Board") concluded that the Northeastern University Police Department's (NUPD) Sergeants and Sergeant Detectives were not supervisors and included them in a bargaining unit represented by the intervenor, American Coalition of Public Safety (ACOPS).  When Northeastern refused to bargain with the unit, arguing that these two categories of employee met the definition of supervisors, the Board found that Northeastern committed an unfair labor practice.  See id. § 158(a)(1), (5).  Northeastern petitions that the order is error and seeks to vacate the unfair-labor-practice finding.  The Board cross-petitions to enforce its order.

For the reasons which follow, we deny the Board's cross-petition for enforcement, vacate its unfair-labor-practice finding against Northeastern, and remand with instructions to address any remaining issues in a manner consistent with this opinion.  The Board's conclusion that Sergeants and Sergeant Detectives are not supervisors deviates from its own precedents without adequate explanation and is not supported by the record.  And because we hold that substantial evidence supports the

conclusion that Sergeants and Sergeant Detectives were supervisors by virtue of their authority to assign their subordinates and exercise independent judgment while doing so, we need not and do not reach the other issues argued by the parties.

## I. Background

We recount the background of general facts about the operation of the NUPD, which are supported by substantial evidence of record, drawn from testimony and other evidence introduced at a two-day evidentiary proceeding held before the Regional Director for Region 1 of the NLRB on March 21 and 22, 2023. We discuss more particular evidence as to supervisory authority and independent judgment when we turn to our analysis in Part III, infra.

Northeastern is a private, non-profit university with its primary campus located in Boston, Massachusetts. The NUPD is responsible for the safety and security of students, faculty, staff, facilities, and visitors on property owned, occupied, or leased by Northeastern as well as the areas surrounding that property. NUPD operates twenty-four hours a day, every day of the year.

The NUPD is commanded by a Chief of Police and a Deputy Chief. Three Lieutenant Commanders report to the Chief and Deputy Chief, two of whom oversee the two NUPD divisions relevant to this case: Patrol and Investigations. The Lieutenant Commander of

Patrol oversees eight full-time Patrol Sergeants, forty Officers, fourteen to twenty unarmed security guards called Community Service Officers (CSOs), as well as an unspecified number of NUPD dispatchers with the title of Operators. Patrol Officers and CSOs in turn report to Sergeants.[1] The Lieutenant Commander of Investigations oversees two Sergeant Detectives, three Detectives, and a variable number of officers temporarily assigned to detective duty (TAD).[2] Sergeant Detectives oversee Detectives and TAD officers. There are three different types of police activities involved in this case: daily patrol shifts, the Incident Containment Team (ICT), and details.

**Daily Patrol Shifts**

Patrol Officers work in three shifts that run from 8:00 a.m. to 4:00 p.m., 4:00 p.m. to midnight, and midnight to 8:00 a.m. Typically there are five or six Patrol Officers and two to four CSOs assigned to each shift. Sergeants begin and end their shifts two hours earlier than officers, and two Sergeants are typically assigned to each shift. One Sergeant acts as the district supervisor and remains in the station for the assigned

---

[1] Unless otherwise specified, we use the generic term "officers" to refer to all employees subordinate to a Sergeant.

[2] These officers, commonly referred to as "TAD" officers, are "typically . . . police officer[s or] . . . CSO[s]" who are temporarily assigned to the investigations unit "in order to give them experience in that role."

shift, performing administrative tasks. The other acts as the patrol supervisor and may go out on patrol during the shift. Lieutenants are present on campus only from around 6:00 a.m. to 4:00 or 5:00 p.m., Monday through Friday. When not on campus, Lieutenants can be reached by cell phone if necessary. After 4:00 or 5:00 p.m. and before 6:00 a.m., as well as on weekends, Sergeants are the highest ranking NUPD personnel on duty.

NUPD officers are assigned to shifts through a bidding process. Officers submit a request to work the day shift, evening shift, or night shift, and those requests are honored in order of seniority.

Sergeants and Sergeant Detectives are responsible for assigning duties to their subordinates at each shift. The NUPD Patrol Deployment Plan establishes the baseline number of officers to be deployed to the various areas of responsibility on the Northeastern campus in Boston. The Deployment Plan is typically prepared annually by the Lieutenant Commander of Patrol. Sergeants are responsible for monitoring officers' deployment in accordance with the responsibilities given to them under the terms of the Deployment Plan. Sergeants select which on-duty officers will be assigned to a particular location. These initial assignments are based on the contents of an intelligence report NUPD produces each day containing information about activity on and off campus, crime trends, and other information. There are no formal criteria

Sergeants must use when assigning officers, and Sergeants may assign officers as they see fit, which may or may not involve taking into account a particular officer's strengths and weaknesses. A Sergeant is authorized, for example, to assign additional personnel to an area where intelligence reports indicate they are needed and to instruct those officers as to locations. A Sergeant is also authorized to assign a bike-trained officer to patrol a certain sector on a night where there are expected to be many people outdoors in that area. Sergeants provide these initial assignments and instructions during roll call at the start of each shift.

Sergeant Detectives assign overall duties to Detectives and TAD officers in light of their subordinates' workload and any specialties they have. Sergeant Detectives set priorities as to which cases Detectives and TAD officers should investigate first.

Sergeants are authorized to adjust, and do adjust, assignments throughout a shift. For example, when a report of a sexual assault is received, the nearest officer responds initially, but the Sergeant on duty then determines which of the on-duty officers should be dispatched to take control of the situation and conduct interviews, particularly of the victim. Sergeants base this determination on their assessment of the officers' relevant training. Were an officer taken off their initial assignment to interview a victim of sexual assault,

Sergeants are authorized to then redeploy other officers to cover the interviewing officer's area of responsibility.

**ICT**

The NUPD maintains an emergency-response unit known as the Incident Containment Team.  The ICT is comprised of specially trained personnel and responds to emergency situations such as active shooters in a manner comparable to a traditional SWAT team. ICT personnel are selected for the assignment by the Deputy Chief and can be Patrol Officers, Detectives, or Sergeants.

Sergeants also redeploy officers to respond to a developing incident.  When the incident is serious, such as a report of an active shooter or armed individual on campus, the Sergeant is authorized to deploy the ICT after determining that the incident poses a threat of harm to the community.  When deploying the ICT, Sergeants determine whether to call in additional, off-duty ICT officers based on the circumstances of the incident.  For incidents that are not routine, but not so serious as to warrant deployment of the ICT, such as a shooting that takes place on the edge of campus but does not pose the threat of an active shooter, a Sergeant is authorized to redeploy multiple officers to the area until the incident is mitigated or ended.

The most senior person on the scene serves as the incident commander when the ICT is deployed.  During evening and night shifts and on weekends, the most senior person on shift is

usually a Sergeant.  In their role as incident commander, Sergeants determine how the ICT and its resources are deployed, as well as where responding units from partner law-enforcement agencies should be staged based on the resources that are needed.  The incident commander is responsible for directing the ICT as to setting up a perimeter, establishing a "camp post," and determining where units will and will not go.

**Details**

Officers can also be assigned to a "detail," which is a discrete assignment related to a request from an individual or organization that is on campus for an event such as a sporting event, concert, dance, speaking engagement, or construction project.  Events that require a detail occur weekly, and sometimes more frequently.

Sergeants are responsible for assigning officers to details, including determining how many staff are required for a particular detail.  Sergeants request that officers volunteer for the detail, and if more officers volunteer than are needed, Sergeants select the officers to be assigned based on a priority list as required by the officers' collective bargaining agreement. If fewer officers volunteer than are needed, a Sergeant decides whether to "force" non-volunteers to work the detail.  A Sergeant then determines where in the detail those officers should be assigned and, when there are multiple events occurring

simultaneously, which event should be prioritized for staffing and to which detail a particular officer should be assigned.

## II. History Before the Board

On March 1, 2023, ACOPS filed a petition with Region 1 of the NLRB to represent a bargaining unit comprised of NUPD Sergeants, Sergeant Detectives, and Detectives. Northeastern objected to the inclusion of Sergeants and Sergeant Detectives in the unit on the grounds that those individuals were supervisors within the meaning of Subsection 2(11) of the NLRA, 29 U.S.C. § 152(11). The Regional Director held a hearing on this issue on March 21 and 22, 2023.

The Regional Director issued a Decision and Direction of Election on August 17, 2023, in which she concluded that Northeastern had failed to carry its burden of proving that Sergeants and Sergeant Detectives satisfied the statutory test for determining whether an employee is a supervisor.

The Regional Director made three findings, each of which is challenged by Northeastern. First, she concluded that Northeastern had met its burden to show as to a limited category of activities that "[S]ergeants have a significant role in officers' assignments." Second, she went on to find that as to that limited category, Northeastern did not make the necessary showing that "[S]ergeants exercise independent judgment in making assignments." Third, she found as to the other exercises of

authority as to the ICT and details that the authority did not rise to the level of assignment and should instead be viewed as authority to direct.[3]  The Regional Director then ordered an election be held as to whether the members of the bargaining unit wished to be represented by ACOPS.  Northeastern filed a request for review of the Regional Director's decision with the Board, which was denied in a one-page order on March 8, 2024.

The representation election was held on September 11, 2023.  While Northeastern's request for review was pending, the bargaining unit voted that ACOPS would be its representative.  The Regional Director certified the Union as the bargaining representative for NUPD's Sergeants, Sergeant Detectives, and Detectives on September 21, 2023.

In response to the Union bargaining demand, Northeastern stated that it would bargain only as to Detectives because the Sergeants and Sergeant Detectives were supervisors.  The Union then filed an unfair labor practice charge based on Northeastern's refusal to bargain, alleging that Northeastern violated subsections 8(a)(1) and (5) of the NLRA.  The Board's General Counsel issued a complaint and notice of hearing on December 15,

_____

[3]     The Regional Director also concluded that Sergeants and Sergeant Detectives were not supervisors, contrary to Northeastern's argument, because they did not discipline or have responsibility when directing employees, nor did they adjust employees' grievances.  We need not reach these alternate grounds.

2023.  Northeastern's answer stated that its refusal to bargain was lawful because the bargaining unit included Sergeants and Sergeant Detectives, who were supervisors.  The General Counsel moved for summary judgment on March 25, 2024.  The Board transferred the case from the Regional Director to a three-member Board panel on March 28, 2024.  The panel issued a two-and-a-half-page decision and order on May 21, 2024, granting summary judgment to the Board and ordering Northeastern to bargain with ACOPS, but it did not revisit the issue of whether Sergeants and Sergeant Detectives were supervisors because it had been litigated and resolved in the underlying representation hearing before the Regional Director.  Because the Board ratified the Regional Director's reasoning, we refer to the Board rather than the Regional Director in our analysis.

### III. Analysis

This court may indirectly review the issue of certification of the two categories of employees which underlies the unfair labor practices charge.  "[E]mployers cannot obtain direct review of unfavorable certification decisions." Telemundo de P.R., Inc. v. NLRB, 113 F.3d 270, 272 (1st Cir. 1997).  Instead, employers who are dissatisfied with the outcome of a representation proceeding must "refuse to bargain and . . . raise any infirmity in the certification decision as a defense to the unfair labor practice charge." Id.  The NLRA "makes full provision for judicial

- 12 -

review of the underlying certification order by providing that 'such certification and the record of such investigation shall be included in the transcript of the entire record required to be filed' in the Court of Appeals." Boire v. Greyhound Corp., 376 U.S. 473, 477 (1964) (quoting 29 U.S.C. § 159(d)).

The Board's factual findings must be supported by substantial evidence in the record as a whole. See 29 U.S.C. § 160(e); Telemundo de P.R., 113 F.3d at 274 (citing Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951)). "The substantiality of evidence must take into account whatever in the record fairly detracts from its weight." Universal Camera, 340 U.S. at 488. "The Board . . . may not distort the fair import of the record by ignoring whole segments of the uncontroverted evidence . . . ." Me. Yankee Atomic Power Co. v. NLRB, 624 F.2d 347, 360 (1st Cir. 1980).

"While the substantial evidence standard governs our review of the facts, we also evaluate the Board's decision for 'mistakes of law . . . and [sic] arbitrary and capricious reasoning.'" Good Samaritan Med. Ctr. v. NLRB, 858 F.3d 617, 629 (1st Cir. 2017) (quoting Boch Imports, Inc. v. NLRB, 826 F.3d 558, 565 (1st Cir. 2016)). The Board errs when it ignores its own precedent or departs from its own precedent without articulating a reason for its departure. See NLRB v. Wang Theatre, Inc., 981 F.3d 108, 112 (1st Cir. 2020).

The NLRA excludes from bargaining units "any individual employed as a supervisor." See 29 U.S.C. §§ 152(3), 157. Employees are supervisors within the meaning of the statute if: (1) they "hav[e] authority . . . to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances"; (2) their exercise of that authority "is not of a merely routine or clerical nature, but requires the use of independent judgment"; and (3) they hold that authority "in the interest of the employer." Id. § 152(11); see NLRB v. Ky. River Cmty. Care, Inc., 532 U.S. 706, 713 (2001). Northeastern bears the burden of proving the applicability of the supervisory exception. See Ky. River Cmty. Care, 532 U.S. at 712.

The parties agree that Sergeants and Sergeant Detectives hold their authority in the interest of their employer and so the third test is met. As to the first test, the Board agrees that Sergeants and Sergeant Detectives possess authority to assign in the limited context of patrol duties and oversight of investigations, respectively. The questions before us are (1) whether Sergeants and Sergeant Detectives use independent judgment when exercising that authority and (2) whether substantial evidence supports the Board's determination that sergeants lack the authority to assign altogether as to the ICT and details.

- 14 -

On review of the entire record, we conclude the Board's determination that Sergeants and Sergeant Detectives are not supervisors is not supported by substantial evidence, the Board committed errors of law when it deviated from its own precedent without adequate explanation, and the Board ignored material, uncontested evidence.[4]

**Assignment as to Patrol Duties and Investigations and Independent Judgment**

The Board acknowledged that Sergeants engage in the supervisory function of "assign" when they assign officers to patrol a location. It also concluded that this assignment did not involve the exercise of independent judgment on the grounds that their exercise of judgment was circumscribed by the NUPD's Deployment Plan. In doing so, the Board mistook the statutory requirements and "either ignored completely or downplayed to an unjustified extent," Me. Yankee, 624 F.2d at 363, substantial evidence to the contrary. To exercise independent judgment, "an individual must at minimum act, or effectively recommend action, free of the control of others and form an opinion or evaluation by discerning and comparing data." NLRB v. NSTAR Elec. Co., 798 F.3d 1, 13 (1st Cir. 2015) (quoting In re Oakwood Healthcare, Inc., 348

---

[4] Because we address only the assignment function and independent judgment in that context, we do not reach Northeastern's argument that the Board changed its position as to the remaining argued supervisory functions and did so contrary to the text of the NLRA.

NLRB 686, 692-93 (2006)). "[J]udgment is not independent if it is dictated or controlled by detailed instructions, whether set forth in company policies or rules, the verbal instructions of a higher authority, or in the provisions of a collective bargaining agreement." Id. (quoting Oakwood Healthcare, 348 NLRB at 693). Even if a judgment is made free of the control of others, it still does not involve the exercise of independent judgment "[i]f there is only one obvious and self-evident choice . . . or if the assignment is made solely on the basis of equalizing workloads" because "the assignment is routine or clerical in nature." Id. (alterations in original) (quoting Oakwood Healthcare, 348 NLRB at 693).

The Deployment Plan did not prevent Sergeants from exercising independent judgment. "[T]he mere existence of company policies does not eliminate independent judgment from decision-making if the policies allow for discretionary choices." Oakwood Healthcare, 348 NLRB at 693. Here, the Deployment Plan explicitly provided that Sergeants were to adjust the plan as circumstances warranted. Lt. Adam Keeling, NUPD's Administrative Lieutenant, testified at the evidentiary hearing as a witness for Northeastern that Sergeants were expected to adjust deployment as necessary before a shift began based on the NUPD's intelligence reports and that such adjustments did in fact take place.

The Deployment Plan establishes a baseline as to how many officers should be deployed to a particular area each shift, but Sergeants possess broad authority to redeploy officers in response to developing events. Sergeants adjust deployment when an officer's duties are taking longer than expected, when a particular officer is best suited to respond to a report, and when emergencies occur that do not require a response from the ICT. These redeployments move officers from one section of campus to another and necessarily involve altering an employee's place of assignment. They also involve the assignment of significant overall duties, such as preventing an off-campus shooting from moving onto Northeastern's campus. NUPD Sgt. Mark Washington, who was presented by the Board's counsel as a witness at the hearing, testified as to a specific example, in which the Patrol Lieutenant tasked Sergeants with addressing a rash of bicycle thefts, and Sgt. Timothy Love developed a plan to deploy officers in plainclothes to combat those thefts. Unlike directing a nurse "to immediately give a sedative to a particular patient," NSTAR Elec., 798 F.3d at 16 (quoting Oakwood Healthcare, 348 NLRB at 689), the duties being assigned when Sergeants redeploy subordinate officers are complex, multi-step processes, not discrete tasks. These redeployments also require the use of independent judgment: Sgt. Washington testified that when assigning officers to non-ICT

incidents, an officer's skills and weaknesses "are factors in giving [those] officers tasks."

The Board erred in determining that Sergeant Detectives likewise lack independent judgment when assigning cases to Detectives. Each day, Sergeant Detectives take into account a Detective's "specialty" when assigning cases. This specialty includes specialized training, but also whether a Detective "has a propensity to do a very good job" on particular types of cases. While the Board did discuss this aspect of case assignment, its conclusion that Sergeant Detectives' assessment of their subordinates' specialties did not constitute independent judgment is at odds with the Board's statement in Oakwood Healthcare that "if the registered nurse weighs the individualized condition and needs of a patient against the skills or special training of available nursing personnel, the nurse's assignment involves the exercise of independent judgment." 348 NLRB at 693; see also id. ("[T]he supervisor determines 'who shall do [the job]' and in making that determination the supervisor makes '[a] personal judgment based on personal experience, training, and ability.'" (alteration in original) (quoting NLRB, Legislative History of the Labor Management Relations Act of 1947, 1303 (1948))).

The Board committed legal error when it departed from Oakwood Healthcare without articulating a reason for this departure. The Board instead relied on a case finding there is no

independent judgment involved when a foreman assigns members of a construction crew based on their specific trade skills because such assignments are self-evident.  See In re Shaw, Inc., 350 NLRB 354, 355-56 & n.9, n.10 (2007) (giving the example of assigning a fuser to fuse a plastic pipe and a welder to handle a metal pipe). The record indicates that the detectives are more comparable to nurses in that they can investigate various incidents or crimes but may be assigned to a specific case based on their training when such a case arises.

**Exercise of Assignment Authority and Independent Judgment as to the ICT and Details.**

The Board also erred as to its finding that the authority over the ICT and details was not assignment but something lesser.

"[T]he power to assign implicates three distinct types of activities: 'designating an employee to a place (such as a location, department, or wing),''appointing an employee to a time (such as a shift or overtime period),' and 'giving significant overall duties . . . to an employee." NSTAR Elec., 798 F.3d at 12 (emphasis and omission in original) (quoting Oakwood Healthcare, 348 NLRB at 689).  The Board stated that redeployment of officers and ICT deployment were "ad hoc instruction[s] that the employee perform a discrete task," making it more like direction than assignment.  See In re Croft Metals, Inc., 348 NLRB 717, 722 (2006).  This misreads the record and erroneously minimizes

- 19 -

Sergeants' role in those circumstances. Under Board precedent, ad hoc instructions include activity such as directing a clerk to "restock[] toasters before coffeemakers" or a nurse "to immediately give a sedative to a particular patient." Oakwood Healthcare, 348 NLRB at 689. But "designating a nurse 'to be the person who will regularly administer medications to a patient or a group of patients' is an assignment." NSTAR Elec., 798 F.3d at 16 (quoting Oakwood Healthcare, 348 NLRB at 689).

The undisputed evidence also demonstrates that Sergeants assign the ICT to a particular location and to carry out significant overall duties. Sergeants determine when and whether to deploy the ICT, determine whether it is necessary to call in off-duty ICT officers, designate where the ICT will deploy, and instruct them in the way they will carry out their duties. Sergeants are authorized to instruct ICT officers to carry out discrete tasks, such as clearing a particular building, but they issue such instructions to effect their decisions to deploy ICT officers and other personnel. Lt. Chris VonHandorf, the Lieutenant Commander of Patrol, testified that Sgt. Allison Piantedosi, acting as the officer in charge of the ICT, responded to a bomb threat at the campus Student Center by deploying officers to positions in and around the Student Center, allocating officers to an inner and outer perimeter, and calling for additional personnel from the Boston Police Department. The Board also erred in

separating out the tasks Sergeants assign to ICT personnel to focus on only one at a time.  See id. (viewing direction as instructing a nurse to perform a single task, but assignment as instructing a nurse to perform a group of related tasks).

The Board also committed legal error in concluding that deploying the ICT does not require independent judgment.  Under Board precedent, "the discretion to determine when an emergency exists . . . involve[s] the exercise of independent judgment." Oakwood Healthcare, 384 NLRB at 693-94.  The record reflects both that Sergeants have the authority to decide whether to deploy the ICT and that a Sergeant did in fact exercise that authority based on the belief that there was an armed individual on campus.  The Board's conclusory assertion that "there is no evidence that deploying the ICT requires independent judgment" is thus contrary to the record and its caselaw.  The same is true of a Sergeant's decision to call in partner law-enforcement agencies.  Once the decision has been made to deploy the ICT, Sergeants continue to exercise independent judgment in the instructions they give to ICT officers and partner agencies as the incident unfolds, including directing other officers "to evacuate buildings, to search students' rooms, to contact outside assistance such as police or fire departments, and to deploy additional . . . personnel." NLRB v. Quinnipiac Coll., 256 F.3d 68, 78 (2d Cir. 2001).  Such emergency situations demand independent judgment because they "do

- 21 -

not admit of resolution by rote reference to a policy manual." Id.

The Board's conclusion that Sergeants do not exercise independent judgment when assigning officers to details is not supported by substantial evidence. The Board focused only on the fact that the collective bargaining agreement governs which officers can be forced to accept details, but that fact alone cannot be substantial evidence for its decision when the record demonstrates that Sergeants determine the number of officers to be assigned and which assignments require "forcing." Sergeants determine, in the first instance, whether officers should be assigned to events for which the organizers have not themselves requested that officers be present. When officers have been requested, Sergeants then determine whether the requested number of officers is appropriate based on information provided by the requestor as to the nature of the detail. When too few officers volunteer for the day's details, Sergeants assess which details are important enough to justify "forcing" non-volunteer officers to work the assignment and will reassign officers from lower-priority details if necessary. Record evidence, in the form of an email from Sgt. Carlos E. Ramirez, demonstrates that Sergeants did, in fact, exercise this authority as described. Sgt. Ramirez's email states that there were four details scheduled for March 15, 2023, which were not fully staffed as of March 14, 2023. The email

notes that two of those details were "no force" and two were "force" and states which officers would be forced to work each detail.

The Board's conclusion that Sergeants and Sergeant Detectives are not supervisors deviates from its own precedents without adequate explanation and is not supported by substantial evidence. Rather, when viewed as a whole, the record shows that Sergeants and Sergeant Detectives have authority to assign subordinates, exercise independent judgment while doing so, and hold that authority for the benefit of Northeastern, making Sergeants and Sergeant Detectives supervisors within the meaning of the NLRA.

## IV. Conclusion

For the foregoing reasons, we deny the Board's application, vacate its unfair-labor-practices finding against Northeastern, and remand with instructions, consistent with this opinion, to address any remaining issues such as, for example, whether to decertify the bargaining unit and hold a new election or simply eliminate Sergeants and Sergeant Detectives from the unit's membership. See id. at 81.